UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

NOV 1 0 2014

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

|                                              |     |                    |
| -------------------------------------------- | --- | ------------------ |
| REBECCA R. GRAY,                             | )   |                    |
|                                              | )   |                    |
| Plaintiff,                                   | )   |                    |
|                                              | )   |                    |
| v.                                           | )   | Civil No. 11-2188  |
|                                              | )   |                    |
| ANTHONY FOXX,[1] Secretary                   | )   |                    |
| United States Department of Transportation,  | )   |                    |
|                                              | )   |                    |
| Defendant.                                   | )   |                    |

## MEMORANDUM OPINION

Before the Court is the defendant's motion for summary judgment [47] on the plaintiff's claims of discrimination, retaliation, and hostile work environment. Upon consideration of the defendant's motion [47], the plaintiff's opposition [54] thereto, the applicable law, and the entire record herein, the Court will GRANT the defendant's motion for summary judgment.

## I.    BACKGROUND

The following alleged facts are undisputed by the Department of Transportation ("DOT") defendant:[2]

The plaintiff, Rebecca Gray, is a woman in her sixties. Pl.'s Compl. ¶ 2, ECF No. 1. Gray received an undergraduate degree in psychology and has more than three decades of professional experience in related fields. *Id.* ¶ 5. In April 1999, she "accepted a position as a

---

[1] The plaintiff's complaint names former Secretary of the Department of Transportation Ray LaHood as the defendant in this suit. Anthony Foxx is the current Secretary. Thus, pursuant to Federal Rule of Civil Procedure 25(d), Secretary Foxx replaces former Secretary LaHood as the proper named defendant in this suit.

[2] As this Memorandum Opinion will illustrate *infra*, the alleged "facts" that Gray claims are in dispute, Pl.'s Statement of Material Facts, ECF No. 55, are either not actually disputed, *id.* ¶¶ 1-6, 10 (first sentence), unnecessary for the disposition of this motion, *id.* ¶¶ 7-9, prove not to be "material," *id.* ¶¶ 11-12, 15, or not part of a "genuine" dispute, *id.* ¶ 10 (second sentence), 13-14, 16-26.

Human Factors Analyst with Innovative Solutions International, a government contractor providing support services for the [Federal Aviation Authority ('FAA')]"—an agency within the DOT—in Washington, D.C. *Id.* ¶ 7. The FAA's Human Factors Research and Engineering Group ("Human Factors Group") "analyzes how people see, hear, think and physically function to ensure systems work as effectively and safely as possible." Pl.'s Opp'n 3-4, ECF No. 54. In October 2001, Gray took a position with L-3 Communications Titan ("Titan"), providing similar services for the FAA's Human Factors Group. *Id.*; Opp'n Ex. P at 248[3] (Gray Aff. Nov. 20, 2010), ECF No. 55. Titan (and therefore Gray) was a subcontractor for HiTech—the business that held the relevant contract with the Department of Transportation. *See* Opp'n Ex. P at 248; Def.'s Mot. Summ. J., Statement of Material Facts ("Def.'s Statement") ¶ 2, ECF No. 47.

During her time at the FAA, Gray's direct supervisor was Glen Hewitt. Hewitt's supervisor—and Gray's second-level supervisor—was Dr. Paul Krois, the Acting Program Director for the Human Factors Group during "most of the time" of the alleged discrimination and retaliation. Compl. ¶ 8; Opp'n at 4.

In July 2005, Gray, who remained a subcontractor, applied for two positions within the FAA's Human Factors Group. Compl. ¶ 9.[4] However, on December 15, 2005, Gray "learned that the [Human Factors Group] selection committee had" selected two men—Glen Gallaway

---

[3] When referring to the document encompassing Plaintiff's Opposition Exhibits A-S, the Court will cite to the pages of the aggregate document, *see e.g.*, Opp'n Attach. at 1-3 (Index of Exhibits), and not to the pages of each specific Exhibit.

[4] In an attempt to further establish a "pattern of prohibited gender discrimination, *id.* ¶ 37, Gray also claims "she had previously applied unsuccessfully for vacancies within this group on [] other occasions, only to be passed over in favor of male applicants." *Id.* ¶ 9. In her complaint in this case, Gray states that she submitted four unsuccessful applications, *id.*, while in her sworn deposition, Gray cites five such applications, Opp'n Ex. N at 169 (Gray Dep., Aug. 22, 2007). The DOT notes that its Human Factors Group "has no records of [Gray] applying for vacancies prior to 2005," Def.'s Mot. Summ. J. 7, and Gray does not counter with any documentation of such applications. On account of Gray's inconsistency in the presentation of her claims of any prior applications, coupled with a complete lack of documentary evidence, the Court cannot "draw [any] reasonable inferences in her favor" regarding the alleged applications prior to the 2005 nonselections. *Cf. Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (emphasis added). As such, the Court will only focus on the two 2005 nonselections that are the immediate subject of Gray's EEO complaint.

and Edmundo Sierra—instead of Gray for the available positions. *Id.* ¶ 13. Following her nonselection, Gray informally reported her gender and age discrimination claims on or around January 6, 2006.[5] Gray's allegations were known to her employers prior to Gray's formal Equal Employment Opportunity ("EEO") filing. *See* Opp'n Ex. I at 87.[6] Gray filed her first formal complaint in March 2006. *See id.* Ex. D at 39-44.[7]

Gray alleges—and the DOT does not dispute—that one month following her informal complaint, she was removed as a presenter at a seminar and "relegate[ed] [] to just taking notes." Compl. ¶ 26. Gray further claims that Krois excluded her "from attending [a] meeting to introduce the new [Human Factors Group] director." *Id.* Finally, Gray presents a series of emails and records written in January and February 2006 by Krois, Hewitt, and Dino Piccione, another supervisor within the Human Factors Group,[8] which criticized Gray's professional conduct. Opp'n Exs. H-I at 79-89. While these emails were circulated among supervisors within the

[5] The Court does not know when Gray first reported her discrimination charges because Gray never specifies, in her complaint or opposition brief, when she first filed an informal complaint. She merely makes passing references to the existence of an informal complaint. *See* Compl. ¶¶ 49, 51; Opp'n at 10. However, the record before the Court indicates that any informal complaint would have been made *after* December 15, 2005, despite Gray's repeated assertion that she filed her *formal* complaint on that date. *See, e.g.*, Compl. ¶ 25; Opp'n at 2, 19. In support of the proposition that she first filed a complaint on December 15, 2005, Gray cites Exhibit D to the opposition brief. *See* Opp'n at 2. Yet Exhibit D contains a formal filing that is dated, presumably in Gray's handwriting, March 16, 2006. Opp'n Ex. D at 44. The filing also bears a March 16 date stamp. *Id.* at 39. It appears that Gray confuses the date she found out that she was not selected for two positions with the FAA, *see id.*; Compl. ¶ 13, with the date of both her informal complaint and her formal EEO complaint. Upon an independent review of the Exhibits filed in support of the plaintiff's opposition, the Court's conclusion is that the initial *informal* complaint occurred on or around January 6, 2006. Gray submits to the Court an email dated January 26, 2006 and written by Krois to human resources personnel in which he references an informal case number 2006-20194-FAA "conveyed to [him] via email dated 1/6/06." Opp'n Ex. I at 87.

[6] Krois' email states that the informal complaint memorandum was dated "1/6/05," but because the plaintiff does not allege any such complaint prior to December 2005, the Court will assume that Krois actually meant to write "1/6/06," since that is the date he claims that he received the memorandum.

[7] While both her Complaint in this matter and the 2010 DOT Report of Investigation cite March 26, 2006 as the date she filed her formal EEO complaint, Compl. ¶ 14; Opp'n Ex. O at 225, the EEO complaint itself is dated March 16, 2006. *See* Opp'n Ex. D at 39, 44.

[8] Piccione also took part, along with Hewitt, in evaluating Gray and the other candidates for the two open positions. *See, e.g.*, Opp'n Ex. C at 30.

Human Factors Group, FAA human resources personnel, and supervisors at Titan, Gray was not a recipient of any of these notes.

On April 8, 2008—more than two years after filing her first formal complaint—"Hewitt informed Gray that budget constraints required that her position be eliminated from the Human Factors [Group]." *Id.* ¶ 28. Gray "was officially terminated on April 30, 2008." *Id.* In June 2008,[9] Gray filed her second formal EEO complaint, alleging sex and age discrimination, as well as unlawful reprisal because of her first complaint. Opp'n Ex. O at 233-35.

After Gray filed her complaint in this Court on December 9, 2011, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and the Age Discrimination in Employment Act of 1964 ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, the DOT moved to dismiss or, in the alternative, for summary judgment on Gray's hostile work environment and retaliation claims. Def.'s Mot. Dismiss, ECF No. 10 (seeking dismissal of or summary judgment only on Counts II and IV of the complaint). The Court, Judge Bates presiding, denied the DOT's motion largely on the grounds that insufficient discovery had been provided on the question of whether Gray qualifies as an "employee" under Title VII. *Gray v. Lahood*, 917 F. Supp. 2d 120, 125, 127 (D.D.C. 2013). The Court further denied the DOT's argument that Gray failed to exhaust administrative remedies as to her hostile work environment claim, in particular. *Id.* at 128-129. The DOT's motion for summary judgment, filed on July 2, 2014, does not continue to dispute that Gray has effectively exhausted administrative remedies, pursuant to 29 C.F.R. 1614.407(d), since more than 180 days have elapsed from the time Gray appealed the dismissal of both of her formal complaints to the Equal Employment Opportunity Commission ("EEOC") without a final decision. *See* Compl. ¶¶ 30-32.

---

[9] Gray's complaint is dated June 13, 2008, Opp'n Ex. O at 235, but the Associate Director of DOT's Compliance Operations Division notes, in an email, that "the filing date of the complaint is June 16, 2008, which is the postmarked date of the complaint," *id.* at 239.

## II.    LEGAL STANDARD

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* factual dispute between the parties will not defeat . . . summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A fact is material if, under the applicable law, "it might affect the outcome of the suit." *Id*. at 248. A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. Because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255; *see also Holcomb*, 433 F.3d at 895. A nonmoving party, however, must establish more than "the existence of a scintilla of evidence" in support of its position. *Anderson*, 477 U.S. at 252. The inferences drawn from the evidence "must be reasonably probable and based on more than mere speculation." *Rogers Corp. v. E.P.A.*, 275 F.3d 1096, 1103 (D.C. Cir. 2002) (citations omitted). Indeed, "the nonmoving party may not rely solely on allegations or conclusory statements[;] . . . it must present [supporting] facts that would enable a reasonable jury to find in its favor." *See Bowdre v. Richardson*, 131 F. Supp. 2d 179, 183-84 (D.D.C. 2001) (citing *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999)); *see also Exxon Corp. v. F.T.C.*, 663 F.2d 120, 126-27 (D.C. Cir. 1980). If the evidence presented is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50.

## III. ANALYSIS

The Court will not decide whether Gray is an employee for Title VII or ADEA purposes; even if Gray qualifies as an employee under these statutes, she fails to present the Court with disputed facts from which a reasonable jury could conclude that she was terminated, retaliated against, or harassed for a discriminatory reason. As such, the Court will evaluate Gray's claims pursuant to the statutes governing alleged discrimination and harassment of federal employees.

### A. Discrimination

Title VII states that "[i]t shall be an unlawful employment practice for an employer . . . to fail or refuse to hire . . . any individual . . . because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1).[10] Similarly, the ADEA declares that "[a]ll personnel actions affecting employees or applicants for employment who are at least 40 years of age . . . in executive agencies . . . shall be made free from any discrimination based on age." 29 U.S.C. § 633a. In *McDonnell Douglas Corp. v. Green*, the Supreme Court announced the now-familiar burden-shifting framework used to evaluate Title VII discrimination claims. 411 U.S. 792, 802-04 (1973). "First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the [adverse employment action]. . . . Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for

---

[10] Title VII contains a separate provision that applies to federal agencies because § 2000e-2 applies only to private employers. *Id.* § 2000e-16(a) ("All personnel actions affecting employees or applicants for employment . . . in executive agencies . . . shall be made free from any discrimination based on . . . sex . . . ."). However, "[d]espite the difference in language between these two sections, [the Court of Appeals for the District of Columbia Circuit has] held that Title VII places the same restrictions on federal . . . agencies as it does on private employers, and so [the Court] may construe the latter provision in terms of the former." *Bundy v. Jackson*, 641 F.2d 934, 942 (D.C. Cir. 1981) (citation omitted).

discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (internal quotation marks omitted) (citing *McDonnell Douglas*, 411 U.S. at 802, 804). The Circuit has adopted this framework for age discrimination claims pursuant to the ADEA. *Johnson v. Lehman*, 679 F.2d 918, 921-22 (D.C. Cir. 1982).

### 1. Age Discrimination

Gray limits her age discrimination claim to her nonselection for one of the two positions for which she applied in 2005. Compl. ¶¶ 46-47 (citing only the position offered to Edmundo Sierra). "To establish a prima facie case under the ADEA, for a claim involving a failure to hire, the plaintiff must demonstrate that (1) she is a member of the protected class (i.e., over 40 years of age); (2) she was qualified for the position for which she applied; (3) she was not hired; and (4) she was disadvantaged in favor of a younger person." *Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1155 (D.C. Cir. 2004) (citing *Cuddy v. Carmen*, 694 F.2d 853, 857 (D.C. Cir. 1982)). The DOT concedes that Gray "can establish a prima facie case under [the] ADEA." Mot. Summ. J. at 10. However, the DOT offers a legitimate, nondiscriminatory reason for hiring Sierra instead of Gray, citing Sierra's relevant master's degree—as opposed to Gray's bachelor's degree—and "experience managing and conducting human factors research related to the [FAA]'s air traffic control programs," in particular. *Id.* at 5-6, 10; *cf. Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 n.44 (1977) (A "relative lack of qualifications" is among the "most common legitimate reasons on which an employer might rely to reject a job applicant."). As such, the burden shifts to Gray to "produce evidence showing that the [DOT]'s proffered reason is but a pretext for discrimination." *Paquin v. Fed. Nat. Mortgage Ass'n*, 119 F.3d 23, 26-27 (D.C. Cir. 1997) (citing *McDonnell Douglas*, 411 U.S. at 804).

Gray offers no evidence of age discrimination, other than the fact that Sierra was "in his early thirties," Compl. ¶ 13, that could "allow a reasonable trier of fact to conclude that [the FAA's] proffered reason was a pretext for discrimination." *Paquin*, 119 F.3d at 27-28. Gray's conclusory statements regarding her "superior" candidacy and Sierra's lesser qualifications, Compl. ¶ 46; Opp'n at 21, are insufficient to overcome the legitimate reasons provided by the DOT in its motion for summary judgment. *See, e.g.*, *Waterhouse v. D.C.*, 124 F. Supp. 2d 1, 7 (D.D.C. 2000) *aff'd*, 298 F.3d 989 (D.C. Cir. 2002) ("Plaintiff cannot establish pretext simply based on her own subjective assessment of her own performance, for plaintiff's perception of h[er]self, and of h[er] work performance, is not relevant. It is the perception of the decisionmaker which is relevant.") (alterations in original) (internal quotation marks and citation omitted).[11]

Moreover, "[i]n order to justify an inference of discrimination, the qualifications gap must be great enough to be inherently indicative of discrimination." *See Holcomb*, 433 F.3d at 897. "To conclude otherwise would be to render the judiciary a 'super-personnel department that reexamines an entity's business decisions'—a role [the judiciary has] repeatedly disclaimed." *Jackson v. Gonzales*, 496 F.3d 703, 707 (D.C. Cir. 2007) (quoting *Holcomb*, 433 F.3d at 897). During her sparse argument for age discrimination, Opp'n at 20-21, Gray states that "education and experience were the primarily [sic] qualifications." *Id.* at 21.[12] Yet, Gray's seven years of experience as a subcontractor for the FAA "in the Human Factors field," Compl. ¶ 13, compared with Sierra's master's degree and three years of relevant experience while employed by the same subcontractor—Titan—as Gray, Mot. Summ. J. Ex. A, ECF No. 47-1 at 1

[11] This principal applies equally in the gender discrimination context, *infra*.

[12] The DOT agrees, citing these two categories of qualifications in support of its assertion of a legitimate basis for hiring Sierra. *See* Mot. Summ. J. 5-6.

(Sierra Employment Application, citing August 2002 as his start date at Titan's Air Traffic Systems Division), "merely indicate[s] a close call [that] does not get [Gray] beyond summary judgment." *Young v. Perry*, 457 F. Supp. 2d 13, 20 (D.D.C. 2006) (internal quotation marks omitted); *see Aka*, 156 F.3d at 1294 ("In a close case, a reasonable juror would usually assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call."). Thus, the Court must grant the DOT's motion for summary judgment on Gray's age discrimination claim.

### 2. *Gender Discrimination*

Gray further claims that her nonselection for two positions with the FAA's Human Factors Group was due to gender discrimination. Compl. Count I. The DOT counters with legitimate, nondiscriminatory reasons for hiring both Gallaway and Sierra instead of Gray. *See Holcomb*, 433 F.3d at 896 (D.C. Cir. 2006) (The defendant's "qualifications-based justification constitutes a legitimate, nondiscriminatory reason for the allegedly discriminatory action."). As described above, the DOT cites Sierra's advanced degree and relevant experience. Mot. Summ. J. at 5-6, 10. Like Sierra, Gallaway attained a Master's of Science degree. *Id.* at 5. The DOT also notes that, "[t]hough [Gray] had approximately three additional years of experience with the [FAA] than [] Gallaway, [] Gallaway had over thirty years of experience in software design and management." *Id.* (emphasis and citations omitted). Furthermore, embedded within the DOT's qualifications arguments was its dissatisfaction with certain attributes of Gray's work performance, flagged by her direct supervisor, Hewitt, during his deposition as well as in a rating form used to evaluate each applicant for the open positions. *See* ECF No. 48 (Hewitt Dep. Tr., Oct. 1, 2007); Opp'n Ex. C at 30-31.

Where the Court finds that the DOT's proffered rationale for Gray's nonselection is legitimate and nondiscriminatory, the Court need not evaluate whether Gray has satisfied a prima facie case for gender discrimination under Title VII. *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).[13] "Instead, [the Court] proceed[s] to the ultimate question of discrimination *vel non*"—and Gray's prima facie case is just one "part of the evidence [the Court] must consider in addressing that question."[14] *See George v. Leavitt*, 407 F.3d 405, 411, 413 (D.C. Cir. 2005) (internal quotation marks and citation omitted). Since the DOT's burden to put forth evidence of legitimate, nondiscriminatory reasons for Gray's nonselection to refute the plaintiff's prima facie showing is a burden of *production*, not persuasion, the burden has shifted to Gray to persuade the Court, by a preponderance of the evidence, that the DOT's reasoning is pretextual. *See Burdine*, 450 U.S. at 253, 255-56 (when refuting the prima facie case, a defendant "need not persuade the [C]ourt that it was actually motivated by the proffered reasons"). The dispositive inquiry, therefore, is whether Gray has provided sufficient evidence of gender discrimination from which a reasonable jury could conclude that "the explanation given [by the DOT] is a phony reason." *See Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180,

---

[13] "Where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Id.* "Rather, in considering an employer's motion for summary judgment . . . in those circumstances, the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of . . . sex?" *Id.*

*See also id.* at 493 n.1, for the varying formulations of the discrimination prima facie case that this Circuit has articulated.

[14] "Assuming then that the employer has met its burden of producing a nondiscriminatory reason for its actions, the focus of proceedings at trial (and at summary judgment) will be on whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment)." *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998).

Though the *Aka* Court also explained that "a prima facie case that strongly suggests intentional discrimination may be enough by itself to survive summary judgment." *Id.* at 1289 n.4.

1183 (D.C. Cir. 1996) (quoting *Pignato v. Am. Trans Air, Inc.*, 14 F.3d 342, 349 (7th Cir. 1994));

*George*, 407 F.3d at 413 (D.C. Cir. 2005) ("Usually, proffering 'evidence from which a jury could find that [the employer's] stated reasons . . . were pretextual . . . will be enough to get a plaintiff's claim to a jury.'") (citing *Carpenter v. Fed. Nat'l Mortgage Ass'n*, 165 F.3d 69, 72 (D.C. Cir. 1999).[15] Here, Gray has proffered no such evidence.

Gray does not offer evidence that "presents . . . [a] stark superiority of credentials over those of the successful candidates." *Stewart v. Ashcroft*, 352 F.3d 422, 429 (D.C. Cir. 2003). Rather, the plaintiff asserts generally that she was "highly qualified," Opp'n at 8, 19, and conclusorily that Gallaway and Sierra were "less qualified," *id.* at 5; Compl. ¶¶ 12, 18, 46. But, as noted during the Court's examination of Gray's age discrimination claim, nothing in the pleadings or the evidentiary record—including the fact that Gray has worked at the FAA for three or more years longer than Gallaway and Sierra—demonstrates a "qualifications gap . . . *great enough* to be inherently indicative of discrimination." *Holcomb*, 433 F.3d at 897 (emphasis added).

Gray endeavors to overcome her factual deficiency by claiming that Hewitt "downgraded" Gray and "upgraded" Gallaway and Sierra on an applicant rating form in order to prevent a woman from receiving one of the two positions in question. Opp'n at 17; Compl. ¶ 16. Yet the documents to which Gray cites for this proposition, Opp'n Ex. C at 22-31, demonstrate no such nefarious conduct by Hewitt. It is true that a few of the documents in Exhibit C show that Gray received ten points among three of the rated categories, *id.* at 25-27—a total higher

---

[15] "A plaintiff . . . may try in multiple ways to show that the employer's stated reason for the employment action was not the actual reason (in other words, was a pretext). Often, the employee attempts to produce evidence suggesting that the employer treated other employees of a different . . . sex . . . more favorably in the same factual circumstances. . . . Alternatively, the employee may attempt to demonstrate that the employer is making up or lying about the underlying facts that formed the predicate for the employment decision. If the employer's stated belief about the underlying facts is reasonable in light of the evidence, however, there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts." *Brady*, 520 F.3d at 495.

11

than that received among the same categories by Gallaway and Sierra. However, the reasonable inference drawn from the document Gray presumably believes to be indicative of her "downgrade," *id.* at 30-31, is that it is merely a more comprehensive rating form that represents the *final* point tally awarded to each applicant, rather than some ex post facto effort to place Gray below less qualified male applicants. This final form rates each of the eleven applicants under two additional categories—"Education/Degree" and "Comments or Characteristics"—that were not included on the other ratings forms presented in Exhibit C. *Id.* Gray received two points for education, while Sierra, with his master's degree in psychology, received three points and Gallaway, with his master's degree in information science, received "2+" points. Gray lost four points under the "characteristics" heading because of issues related to "personal relations," "deadlines," "multitasking," and "effectiveness," while Sierra gained one point for "research & studies," "work style," and "aggressiveness," and Gallaway received a "+," but no additional points, for characteristics such as "work ethic" and "big picture." *Id.* The Court cannot conclude that "education" and workplace "characteristics" categories on a job applicant rating form are pretextual on their face, since both categories could be considered quite relevant to an applicant's suitability for an FAA position. And Gray provides no evidence that these two categories, under which all eleven prospective candidates were rated, were added to the evaluation process as an attempt to discriminate against her for being a woman. Most significantly, Gray cannot create an inference of gender discrimination from her "characteristics" rating, in particular, given that the other two applicants who received more than one negative point in that category are *men*— Howard Eaton, a military veteran who was assigned negative three points, and Larry Biederman, who received the same negative four point rating that Gray received. *Id.* at 30.

Moreover, Gray offers no *objective* evidence to contradict the assertions of dissatisfaction with particular elements of her work performance that were noted in both Hewitt's deposition and the more detailed rating form. *See Young*, 457 F. Supp. 2d at 21-22 (finding the plaintiff's lack of rebuttal of her supervisor's stated dissatisfaction with her work performance as part of a wider failure "to offer evidence sufficient to permit a reasonable jury to find that defendant's proffered nondiscriminatory reasons for her non-promotion were pretextual"). Hewitt explains that, although Gray's work product could be strong, ECF No. 48 at 114, she also had "difficulty in meeting deadlines" and "difficulty in having the right kind of relationship with people who might be clients," *id.* at 32. And as mentioned above, Gray also received negative points for "multitasking" and "effectiveness" on the applicant rating form. Opp'n Ex. C at 30. In response, Gray argues that "Hewitt admitted in this deposition that Gray often multi-tasked and that any late deadlines actually caused no problems and in fact resulted in a better product. . . . As to not getting along with other people, Gray worked 50 weeks a year, 5 days a week for almost 7 years and only three minor incidents, one of which was manufactured by [] Krois." Opp'n at 19. In her attempt at a rebuttal, Gray does not *deny* missing deadlines or having interpersonal problems in the workplace. Additionally, the fact that Gray has had to multitask in the past does not, alone, lead to the conclusion that she did so *skillfully*. Without more, Gray does not "present any material issue of fact, as [she] fail[s] to call into doubt [her supervisor's] good faith belief that [Sierra and Gallaway were] better qualified for the position[s]." *Young*, 457 F. Supp. 2d at 22.

Alternatively, Gray seeks to establish an inference of discrimination from purported facts specific to her case by depicting a general culture of sexism throughout the Human Factors Group. Yet Gray's "evidence" of a pattern of gender discrimination is insufficient to lead a

reasonable juror to apply a favorable inference to otherwise inadequate evidence of gender discrimination *specifically* related to Gray's nonselection.

First, Gray states that "[f]rom July[] 2004, through January 2007, the professional staff, as distinguished from the administrative support staff, of the Human Factors Group, ranged from nine to eleven men and only one woman, Dr. Ele[a]na S. Edens." Compl. ¶ 19; Opp'n at 7. While a history of all-male hiring could support an inference of discrimination if coupled with other compelling evidence of discrimination, *cf. Aka*, 156 F.3d at 1290 ("[T]he plaintiff's attack on the employer's explanation must always be assessed in light of the total circumstances of the case."), Gray has provided no such additional persuasive evidence here. For instance, Gray claims that "she was not treated professionally as an equal" and that Hewitt "belittled, mocked, and otherwise criticized her competence." Compl. ¶¶ 22-23. Yet Gray fails to provide any evidence of such harassment *as to her* beyond her own deposition and affidavits. Of course, the plaintiff's deposition, alone, may be proper grounds on which to deny summary judgment, since credibility determinations are jury functions. *Anderson*, 477 U.S. at 255. However, Gray's additional failure to link any particular occurrences of purported harassment to *gender* discrimination *does* constitute sufficient grounds on which to grant summary judgment. *See* Compl. ¶¶ 22-23.[16] In her deposition, Gray only claims that Hewitt "yelled and screamed" at her, Opp'n Ex. N at 202, and that Hewitt and Piccione, "would say bad things about the[] work" of female employees while "never" speaking critically of male employees, *id.* at 196-97. But here, a reasonable inference of gender discrimination does not arise from general instances of

---

[16] Trying to bolster her claim of a pattern of discrimination, Gray further states that Edens filed an EEO complaint due to a hostile work environment, and that the complaint "was resolved by letting her work from home." Opp'n at 7 n.3. Gray does not, however, state that the complaint was related to *gender* discrimination, specifically—only that it was related to "general harassment." Opp'n Ex. N at 210. Furthermore, Gray does not provide the Court with any evidence of this alleged incident other than her own deposition during which she repeats the allegation. *See id.* (citing Opp'n Ex. N at 209-10).

"yelling and screaming" or negative critiques of work product without any additional evidence that such interactions also included gender-specific remarks or undertones. Thus, neither claim is sufficient to meet the plaintiff's burden to provide persuasive evidence that the DOT's reasons for Gray's nonselection were pretextual.

Second, Gray contends that at least five other women working in the Human Factors Group[17] "experienced gender harassment." Opp'n at 8-9. Allegations regarding three of these women—Beverly Clark, Anetra Withers, and Margaret Wells—come from Gray's deposition, while Jean Watson and Diana Ford provided affidavits for Gray's lawsuit. Without providing additional evidence, such as a more specific description of events in her own deposition, affidavits from Clark, Withers, and Wells, or gender discrimination-related complaints filed by these women, Gray does not demonstrate pretext underlying the DOT's legitimate reasons for Gray's nonselection simply by stating that Piccione, on two separate occasions, made Clark and Withers cry, *id.* Ex. N at 194-96, and that "there were lots of negative comments about [Wells]," *id.* at 197. Once again, Gray does not specifically claim that the alleged "yelling" and "negative comments" pertained to—or were due to—the female employees' protected status. While Gray's contention that Piccione had also "made some very nasty allegations about how [Clark] got her job and very nasty allegations about a person that [Clark] worked with" could possibly bear some gender-based innuendo, Gray still avoids making any *direct* connections between that alleged comment and Clark's gender. *See id.* at 196.

Watson's affidavit is similarly unhelpful to Gray's gender discrimination claim. Watson states that "[t]he people that fostered [an] attitude" of treating women professionals differently were Mark Rodgers and William Krebs—neither of whom are alleged to have played a role in

---

[17] The Court notes that while these women may not fall into Gray's definition of "professional staff," the plaintiff does implicitly concede that there were numerous female employees, generally, within the Human Factors Group during Gray's time working at the FAA.

any of the allegations—gender discrimination, or otherwise—present in Gray's complaint. *Id.* at 61. Moreover, Watson notes that she has "never worked in the [H]uman [F]actors [G]roup." *Id.*

Ford, a dispute resolution specialist at the DOT, notes in her affidavit that, during her time in the Human Factors Group, nine of twelve or thirteen employees were men. *Id.* at 58. Ford further states that "some" women "expressed discontent with the office environment," citing "concerns that their contributions/ideas were ignored or devalued, lack of support with opportunities for career growth (expansion of duties and/or promotions), superior attitudes, etc." *Id.* Ford also "felt like [she] was treated differently." *Id.* While the Court has no reason to doubt Ford's credibility, her allegations of a sentiment of disparate treatment among some female employees in the Human Factors Group are not enough to demonstrate that a reasonable juror could conclude that the DOT's rationale for hiring Gallaway and Sierra instead of Gray is pretextual. Indeed, the general allegations of dissatisfaction among female employees put forth in Ford's and Watson's affidavits, and in Gray's deposition, do not create a *genuine* issue of material fact regarding whether an employer could reasonably perceive Gallaway or Sierra's qualifications to trump those of Gray. *Anderson*, 477 U.S. at 248 (A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party.").[18]

Since Gray has failed to "produce[] sufficient evidence for a reasonable jury to find that the [DOT]'s asserted non-discriminatory reason [for Gray's nonselection] was not the actual reason and that the [DOT] intentionally discriminated against [Gray] on the basis of . . . sex," the Court must grant the DOT's motion for summary judgment on Gray's gender discrimination claim. *Brady*, 520 F.3d at 494.

---

[18] The Court also notes that the affidavits from Watson and Ford do not provide any witness accounts of the discrimination or harassment allegedly experienced by Gray, specifically.

**B.    Retaliation**

Title VII prohibits the DOT from "discriminat[ing] against any of [its] employees or applicants for employment . . . because [that employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [that employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).[19] The *McDonnell Douglas* burden-shifting framework also governs Title VII retaliation claims based on circumstantial evidence, like Gray's. *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).

> Under that framework, a plaintiff must first establish a prima facie case of retaliation by showing (1) that [s]he engaged in statutorily protected activity; (2) that [s]he suffered a materially adverse action by [her] employer; and (3) that a causal link connects the two. If the plaintiff establishes a prima facie case, the burden shifts to the employer to produce a legitimate, nondiscriminatory reason for its actions. If the employer does so, the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer . . . retaliation from all the evidence, which includes not only the prima facie case but also the evidence the plaintiff offers to attack the employer's proffered explanation for its action and other evidence of retaliation.

*Id.* (internal quotation marks and citations omitted).

Gray effectively claims two categories of unlawful retaliation: a set of occurrences in the immediate aftermath of her first informal complaint and her eventual termination more than two years later.[20]

First, Gray argues that (1) her removal "from making a presentation at a high-profile seminar on February 9, 2006," (2) her exclusion "from attending the meeting to introduce the new

---

[19] For retaliation claims, this Circuit also construes § 2000e-16(a) in terms of § 2000e-3(a) even though § 2000e-3(a) applies only to private employers. *Borgo v. Goldin*, 204 F.3d 251, 255 n.5 (D.C. Cir. 2000); *see also supra* note 10.

[20] Within her retaliation claim, Gray also alleges that she was "publically belittled, mocked, [and] attacked as incompetent . . . ." Compl. ¶ 50. However, Gray links this contention to experiences she allegedly endured *prior* to her informal complaint. *See id.* ¶ 23 ("Whether alone or with others, Hewitt yelled at Gray, belittled, mocked, and otherwise criticized her competence. His treatment was so destructive that Gray sought medical attention in July 2004 and was treated for depression, sleeping and diet issues, nervous anxiety, and severe emotional distress."). Therefore, the Court cannot consider such allegations as part of Gray's retaliation claim.

[Human Factors Group] director, Dr. Terry Allard," and (3) a series of emails featuring complaints regarding Gray's work performance that were sent to third parties all amount to unlawful retaliation. *See* Compl. ¶ 26; Opp'n at 19. As a threshold matter, the Court notes its earlier finding, based on the evidentiary record supplied by both parties, that Gray informally reported her gender discrimination claims on or around January 6, 2006. *See supra* note 5; Opp'n Ex. I at 87. "It is well settled that Title VII protects informal, as well as formal, complaints of discrimination." *Richardson v. Gutierrez*, 477 F. Supp. 2d 22, 27 (D.D.C. 2007). Thus, if Gray presents at least circumstantial evidence that she "suffered a materially adverse action" by DOT after, and solely because of, her informal complaint, the plaintiff would sufficiently demonstrate a prima facie case of unlawful retaliation. *See Jones*, 557 F.3d at 677; *see also Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened ['motivating factor'] causation test stated in § 2000e–2(m).").[21]

If an incident of alleged retaliation occurs *prior* to the date on which Gray's supervisors had knowledge of her informal complaint, such an incident cannot be considered unlawful retaliation under Title VII. *See Jones*, 557 F.3d at 679 ("We agree that Jones's supervisors could

---

[21] Because the Court finds below that all three alleged examples of retaliation that were close in time to Gray's informal complaint are not "materially adverse actions" under Title VII, it is unnecessary for the Court to determine whether the Supreme Court's holding in *Nassar* still permits temporal proximity *alone* to satisfy the "causal link" requirement for a prima facie showing of retaliation. *Compare Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013) ("[T]he but-for causation standard does not alter the plaintiff's ability to demonstrate causation at the prima facie stage on summary judgment or at trial indirectly through temporal proximity.") *and Adams v. City of Montgomery*, 569 F. App'x 769, 772-73 (11th Cir. 2014), *with Butler v. White*, No. 11-574, 2014 WL 4436301, at *12 (D.D.C. Sept. 8, 2014) (Noting that, while temporal proximity can factor into the evaluation of a prima facie case of retaliation, in order to survive summary judgment, plaintiff "must also rule out all other possible explanations of the retaliatory conduct."). While this Circuit has previously held that temporal proximity, on its own, may be sufficient to satisfy the third element in a prima facie case of retaliation, *Singletary v. D.C.*, 351 F.3d 519, 525 (D.C. Cir. 2003) ("a close temporal relationship may alone establish the required causal connection"), the Circuit has yet to address the but-for causation standard established in *Nassar*.

18

not have retaliated against him unless they had knowledge of his protected activity.").[22] Here, the evidence provided to the Court by Gray suggests that any possible decision not to permit the plaintiff to present at the February 9, 2006 seminar would have been made before her supervisors knew of her informal complaint. As mentioned above, Gray presents no evidence—circumstantial or otherwise—that could reasonably support an inference that Krois, Hewitt, or Piccione knew of her informal complaint prior to January 6, 2006.[23] The documents that Gray provides in support of her claim of removal as a presenter consist of two proposed agendas (and a cover email for the first agenda), Opp'n Ex. F at 70-75, and an email from Hewitt instructing Gray to take notes at the February 9 meeting, *id.* at 76. The first draft of the agenda that is provided to the Court does not list Gray as a presenter, and it is dated January 3, 2006. *Id.* at 71-73. Similarly, the email from Hewitt "relegate[ing] [Gray] to taking notes at the meeting," Opp'n at 9, is dated January 5, 2006. *Id.* at 76. Therefore, Gray fails to demonstrate that this purportedly adverse action occurred *after* Krois or Hewitt were aware of her informal complaint.

---

[22] Gray's complaint states that "[o]nce she filed her first complaint on December 15, 2005, *and even before that*, Dr. Krois, Hewitt, Piccone, and other senior officials, had instituted an open retaliation campaign against Gray because of her gender discrimination complaints." Compl. ¶ 50 (emphasis added); *see also* Opp'n at 19. Obviously, it is impossible to "engage in an open retaliation campaign" against Gray because of a complaint if that complaint has not yet come into existence. In fact, Gray's contention that her employer's allegedly retaliatory behavior persisted *before* she complained of gender or age discrimination *dilutes* such claims of retaliation, since a retaliatory action must be one that occurs *because* Gray engaged in protected activity. Stated differently, it surely becomes less likely that Gray's complaint was the *sole cause* of her supervisors' negative behavior if the same negative behavior occurred prior to Gray's complaint.

[23] Gray provides an email, dated December 6, 2005, which she sent to Joan Bauerlein, who was Krois' supervisor, that refers to the hiring of Glen Gallaway and his fewer years of FAA experience. Opp'n Ex. F at 68. While the Court could reasonably infer that the email pertains to a complaint of some form, a "record of conversation" written by Krois notes that Bauerlein spoke with Krois on December 7, 2005 about a complaint from Gray "regarding under use by the human factors office and lack of interaction with the human factors staff." Opp'n Ex. I at 86. Krois states that this was "the first report of" such "tasking issues" that he received. *Id.* The Court does not find that, taken together, these two records—both of which were submitted by Gray—create any reasonable inference that Krois was aware of complaints by Gray relating to gender or age discrimination. Moreover, Gray never claims that she engaged in any statutorily protected activity prior to December 15, 2005. *See* Compl. ¶¶ 25, 50; Opp'n at 19. If the plaintiff does not argue that the Bauerlein email provided any kind of knowledge of protected activity to her employer generally—a fact that is usually sufficient "to permit an inference of retaliatory motive" where an adverse action also took place shortly after a protected activity, *Jones*, 557 F.3d at 679 (internal quotation marks and citation omitted)—then the Court will not, *sua sponte*, afford Gray the benefit of an inference of knowledge from this email.

And even if the Court accepts that Gray's employer knew of her informal complaint prior to January 3, 2006, removal from a presentation is not a materially adverse action, and, consequently, fails to satisfy the second element of the prima facie test for unlawful retaliation. "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). The Circuit has explained that, "[t]ypically, a materially adverse action in the workplace involves 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013) (quoting *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003)). Yet for retaliation claims, an "adverse action" can have a "broader meaning." *Baird v. Gotbaum*, 662 F.3d 1246, 1249 (D.C. Cir. 2011). "[A]ctions giving rise to [retaliation] claims are 'not limited to discriminatory actions that affect the terms and conditions of employment,' but reach any harm that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *Burlington N.*, 548 U.S. at 64, 68). Here, Gray "does not point to a scintilla of evidence suggesting [her alleged removal as a presenter at a meeting] had a material adverse effect upon the terms or conditions of her employment." *Taylor*, 350 F.3d at 1296. Moreover, the Court does not find, under the objective "reasonable employee" standard articulated in *Burlington Northern*, that one's removal as a presenter at a meeting rises to the level of employer conduct that is "likely 'to deter [a] victim[] of discrimination from complaining to the EEOC.'" *Burlington N.*, 548 U.S. at 68 (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997)). The Court does not doubt that if Gray was, in fact, removed as a presenter,[24] such a decision might upset the plaintiff. But "not

[24] Gray does not provide any evidence outside of her own deposition that she was ever slated to present. In fact,

everything that makes an employee unhappy is an actionable adverse action" under Title VII. *Bridgeforth*, 721 F.3d at 663 (internal quotation marks and citations omitted). After all, "[a]ctionable retaliation claims are limited to those where an employer causes '*material adversity*,' not 'trivial harms.'" *Wiley v. Glassman*, 511 F.3d 151, 161 (D.C. Cir. 2007) (citing *Burlington N.*, 548 U.S. at 68). Thus, Gray cannot establish a prima facie case of retaliation even if she was relieved of her duties as a presenter at the February 9 meeting because she filed an informal complaint.

Likewise, Gray does not provide a date for the staff meeting from which Krois allegedly excluded her. As such, there is no way for the Court to verify that this event occurred after the point at which her employer was aware of her informal complaint. But even assuming both that the meeting took place after Gray notified her employer of the protected activity and that Krois purposefully excluded her from the meeting,[25] Gray presents no evidence—and the Court does not believe—that a single instance of exclusion from a weekly meeting "would have persuaded a reasonable employee to refrain from making or supporting charges of discrimination." *Baird*, 662 F.3d at 1250; *see also Casey v. Mabus*, 878 F. Supp. 2d 175, 188 (D.D.C. 2012) ("[T]he incident alleged by the plaintiff was a single, isolated occurrence that, although likely unpleasant, was not sufficiently severe so as to become materially adverse.").

---

Krois states, in his affidavit for the EEO complaint investigation, that Hewitt "was the person responsible for giving the presentation on human factors and enterprise architecture. I'm not sure how [Gray] came to think she should have given that presentation. The first version of the agenda drafted by [] Hewitt in his email dated 1/3/06 . . . showed [Gray] on the list to be potentially invited[, *see* Opp'n Ex. F 70-73]; she did not appear [among the list of presenters] on the agenda." *Id.* Ex. D at 55.

[25] Krois states that "contactors [such as Gray were] not allowed to attend the weekly staff meetings." Opp'n Ex. D at 37, 55. Gray never refutes this statement. In response to a question about whether contractors were permitted to attend weekly staff meetings during her 2007 deposition, Gray answered "[n]ot anymore." *Id.* Ex. N at 193. And when asked whether contractors were allowed to attend such meetings at the time of her alleged exclusion, Gray said, "I would have to go back and see. I have an e-mail on that from our prime contractor. There was a decision made by contracts that contractors weren't supposed to be in any, across the FAA, were not supposed to be in staff meetings." *Id.* To the Court's knowledge, Gray has never submitted any evidence that contractors were entitled to attend the Human Factors Group's weekly staff meetings.

The numerous emails and records criticizing Gray's work performance that the plaintiff further cites as evidence of retaliation, Opp'n Ex. H 79-84, also fail to satisfy the adverse action requirement. As explained, to be considered *materially* adverse, the challenged action must be likely to "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Thompson v. N. Am. Stainless, LP*, 131 S. Ct. 863, 868 (2011). Gray concedes that the emails in question were sent "behind [her] back." Opp'n at 19; Compl. ¶¶ 26-27 (also citing Krois' "behind-the-scenes attacks on Gray's competency and ability to meet deadlines"). Therefore, Gray could not have been dissuaded from pursuing her charge of discrimination by an action of which she was *wholly unaware* until, presumably, well into the formal complaint process.[26] On such grounds alone, the Court cannot find that the emails in question qualify as retaliatory actions.

Furthermore, while a challenged action need not affect the plaintiff's employment status to be considered unlawful retaliation, *Baird*, 662 F.3d at 1249, the action still must at least "produce[] an injury or harm," *Burlington N.*, 548 U.S. at 67. Here, the emails did not injure Gray in any perceivable way. Her supervisors sent most of the emails in question in early 2006, yet Gray was not terminated from her position with the Human Factors Group until April 2008. As such, Gray cannot create a reasonable inference that these emails produced the specific injury of termination. In addition, Gray does not contend that she was treated differently—and for the worse—by her supervisors because of these emails. To the contrary, Gray concedes that the purported hostility from her supervisors has decreased over time, noting that Hewitt, in

---

[26] The only indication that Gray knew her supervisors were communicating with each other about her professional conduct following her informal complaint is the purported confrontation between the plaintiff and Hewitt after a group meeting with Russell Chew, the Chief Operating Officer of the FAA's Air Traffic Organization ("ATO"), held on January 18, 2006. According to Gray, Krois told Hewitt to speak with Gray about her allegedly inappropriate behavior during that meeting. Opp'n Ex. N at 190. However, nowhere does Gray indicate knowledge of the separate emails sent from Hewitt and Piccione to Krois criticizing Gray's conduct at that meeting or of the "record" written by Krois stating the same. *See id.* Ex. H at 79-81.

particular, has been "more careful about" making derogatory comments "over the years." Opp'n Ex. N at 196. Nor does Gray claim that her workload decreased because of these negative comments about her office conduct. And even if she had claimed a cutback in assignments following the emails containing criticism of Gray's behavior, Gray had *already* complained about her under use at least a month prior to the first email cited here by the plaintiff. *See id.* Ex. I at 86. Instead, Gray appears to simply assert that she believes her supervisors wrote emails about her work performance that were unfair or untrue. But without any demonstrable effect on Gray's experience in the workplace, these emails cannot be considered materially adverse actions taken by her employer.

Similarly, the communications from 2006-2007 provided in Opposition Exhibits J-K, at 90-112, which Gray's brief largely ignores, are merely notes demonstrating an assortment of ordinary workday communications between Gray and supervisors, positive comments directed at Gray for work she had done, and criticisms of Gray's work performance sent between supervisors. There is no indication that this collection of emails and notes is anything other than standard communication pertaining to an employee's workplace performance. More importantly, there is no evidence whatsoever that any of these emails or notes represent retaliation for the complaint filed by Gray in early 2006.

The fact that Gray filed a complaint alleging discrimination certainly does not preclude her employer from internally documenting its dissatisfaction with her work performance. Indeed, it is understandable for an employer to seek to create a documentary record to *counter* a claim that it has acted with discriminatory intent.[27] The mere existence of emails and records

---

[27] For example, in June 2007, Krois requested that Tom McCloy, another Human Factors Group supervisor, "provide [Krois] with hardcopy of any and all emails and other documents [McCloy] generated discussing Rebecca Gray from October 1, 2001 to the present." *Id.* Ex. K at 112. Gray attempts to characterize this request as part of a smear campaign orchestrated by Krois. *Id.* at 11 (Gray mistakenly states that McCloy, "[t]o his credit," refused to

critical of Gray's work performance that were written subsequent to a discrimination complaint does not engender an inference of retaliation just because the plaintiff conclusorily labels these documents as retaliatory.[28] Even if, following the Supreme Court's holding in *Nassar*, this Circuit still maintains that close temporal proximity alone is sufficient to establish the causation element of the prima facie case for retaliation, *e.g. Cones v. Shalala*, 199 F.3d 512, 521 (D.C. Cir. 2000), temporal proximity does not repair a deficient showing under the "materially adverse action" element. *See Rattigan v. Holder*, 604 F. Supp. 2d 33, 49 (D.D.C. 2009) ("An employer should be entitled to discuss and even critique employees about legitimate job performance problems without being subjected to suit because Title VII's anti-retaliation provision was not intended to immunize insubordinate, disruptive, or nonproductive behavior at work.") (internal quotation marks and citations omitted).

Second, Gray argues that her termination in April 2008 was retaliation for her discrimination complaint filed more than two years earlier. The DOT proffers a legitimate, nondiscriminatory reason for Gray's termination, stating that, because "the cost of Human Factors research would exceed the projected 2008 budget by over one million dollars, . . . [FAA] officials determined that certain projects needed to be deferred or cancelled, including the statement of work encompassing [Gray's] engineering services."[29] Mot. Summ. J. at 14; *see*

---

produce the requested documents, when, in actuality, McCloy tells Krois he has no such documents to produce, *see id.* Ex. K at 112). However, the Court finds that the only *reasonable* inference from this email is that Krois is seeking to compile a documentary record related to Gray.

[28] Gray also claims that Krois "instructed Hewitt and Piccione to write memoranda, which they did, accusing Gray of being overly aggressive and an embarrassment to the Agency" following the meeting with Russell Chew. Compl. ¶¶ 27. 50; Opp'n at 11, 19 (citing the two emails contained in Opp'n Ex. H at 80-81). Even if Krois directed Hewitt and Piccione to write emails critical of Gray—and Gray presents no clear evidence outside of her pleadings that he did—there is no indication that such emails, of which Gray was unaware until well after they were written, affected Gray in any fashion during the two more years she spent in the Human Factors Group.

[29] The DOT further argues that it did not technically terminate Gray; rather, it decided not to complete a new statement of work with HiTech "encompassing Gray's engineering services," and Hitech then chose not to use Gray to fill its remaining positions within the Human Factors Group. Mot. Summ J. at 14; Def.'s Statement ¶¶ 21-23; *see also* Opp'n Ex. P at 256 (Hewitt Aff., Oct. 26, 2010, stating that "Gray's position was not eliminated . . . . It was up

24

*George*, 407 F.3d at 412 (D.C. Cir. 2005) ("[T]he elimination of the plaintiff's position altogether" is considered one of the "common legitimate reasons for discharge."). In response, Gray offers no evidence sufficient, under *McDonnell Douglas*, to refute the budget constraints cited by the DOT.

Given the DOT's legitimate reason for Gray's termination, the "the only question is whether the employee's evidence creates a material dispute on the ultimate issue of retaliation 'either directly by [showing] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Jones*, 557 F.3d at 678-79 (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983)). The Court evaluates "the three relevant categories of evidence"—Gray's prima facie case, any evidence of pretext, or any other evidence of or against discrimination, *see Aka*, 156 F.3d at 1289—"to determine whether they 'either separately or in combination' provide sufficient evidence for a reasonable jury to infer retaliation." *Jones*, 557 F.3d at 679 (citing *Waterhouse v. D.C.*, 298 F.3d 989, 996 (D.C. Cir. 2002). In her pleadings, Gray declares that "shortly [after her termination], two new persons were hired [by the Human Factors Group], one of whom took over Gray's former tasks with Hewitt." Compl. ¶ 28; Opp'n at 12. In Gray's affidavit for her second EEO complaint, she states, "It is my understanding the office now is intending to 'staff up' and hire. Also, the work I was performing has been assigned to a new contract." Opp'n Ex. O at 236 (2010 DOT Report of Investigation); *see also id.* at 224 (DOT Report of Investigation Summary, stating the same). More than six years after her termination, and following months of discovery in this case, these unsupported statements made by Gray before she filed suit in this Court remain the plaintiff's only purported "evidence" that the DOT's

---

to the contracting company to determine where [] Gray was to work. When funding was concluded for the system acquisition support task, it was up to the contracting firm to distribute the work that remains among their employees.").

budget constraints assertion is just pretext for retaliation. Even if such statements were sufficient to establish a prima facie claim,[30] they are insufficient "for a reasonable jury to find that the employer's asserted non-[retaliatory] reason was not the actual reason." *Cf. Brady*, 520 F.3d at 494; *see also Burdine*, 450 U.S. at 253 (requiring the plaintiff to rebut the defendant's legitimate reason "by a preponderance of the evidence"). Therefore, the Court must grant the DOT's motion for summary judgment on Gray's retaliation claim.

## C.  Hostile Work Environment

As already mentioned, Title VII prohibits employers from discriminating against an individual based on gender with respect to the "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e–2(a).[31] However, Title VII bars not only discrete or tangible employment decisions, but also a "discriminatorily hostile or abusive work environment," for which economic or tangible impact need not be shown. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64-55, 67 (1986)). Thus, gender-based harassment may form the basis of a hostile work environment claim and amount to unlawful discrimination. *Id.*

For such harassment to be actionable, "it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Meritor*, 477 U.S. at 67 (internal brackets and quotation marks omitted). The alleged conduct must be more than "merely offensive." *Harris*, 510 U.S. at 21. To establish a prima facie hostile

---

[30] Gray's statements regarding new hires and a new contract, on their own, also fail to satisfy a prima facie case of retaliation, since Gray does not establish a causal link between her first EEO complaint in 2006 and her termination in 2008. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001) (noting that an alleged retaliatory "[a]ction taken . . . 20 months [after a protected activity] suggests, by itself, no causality at all"). Even if the Court found that the intermittent emails and records noting moments of poor performance by Gray, *see* Opp'n Exs. H-K, were retaliatory under Title VII—and it does not, *see supra*—the existence of such documents would still not be enough to bridge the large gap of time separating the protected activity from the alleged retaliation.

[31] *See supra* note 10 for how this Circuit construes § 2000e-16(a) in terms of § 2000e–2(a) for gender discrimination claims made by federal employees.

work environment claim, Gray must show that (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment occurred because of her protected status; (4) the harassment was severe to a degree which affected a term, condition, or privilege of employment; and (5) her employer knew or should have known about the harassment, but nonetheless failed to take steps to prevent it. *Peters v. D.C.*, 873 F. Supp. 2d 158, 189 (D.D.C. 2012) (collecting cases). Here, Gray does not demonstrate that the alleged harassment occurred because she is a woman and that the harassment was sufficiently severe and pervasive under Circuit law.

While Gray generally asserts that many of the Human Factors Group supervisors created a hostile work environment, Compl. ¶¶ 22, 24-25, the plaintiff only attributes *specific* allegations of abuse to Hewitt. Compl. ¶ 23. Gray never alleges particular incidents of qualifying abuse *as to her* against Krois or Piccione.[32] Given the lofty bar for finding a hostile work environment that this Circuit maintains, it is especially crucial that the plaintiff demonstrate at least a *reasonably probable inference* of a causal link between the alleged abuse and her protected status. Yet outside of conclusory statements in her pleadings, *see* Compl. ¶¶ 22, 41-42, Gray puts forth no evidence of a causal link between the allegations against Hewitt and her gender.

---

[32] Neither internal emails or records criticizing Gray's work performance, which Gray knew nothing about at the time they were written, nor exclusion from a single meeting could be considered part of any severe and pervasive abuse. *E.g.*, *Holmes-Martin v. Sebelius*, 693 F. Supp. 2d 141, 165-66 (D.D.C. 2010) ("[C]riticism of [the plaintiff's] job performance" and plaintiff's "exclusion from meetings," inter alia, did not rise "beyond the level of ordinary workplace conflicts."). As such, specific allegations that Piccione was abusive toward other women—but not toward Gray—are largely unhelpful here. *See* Compl. ¶ 24. The same is true for Gray's allegation regarding the alleged abuse of Eleana Edens' by a member of the Human Factors Group who played no role in Gray's alleged abuse. *See* Compl. ¶ 19; *see also supra* n. 16.

It is also worth noting that the affidavits submitted by Diane Ford and Jean Watson, in support of Gray's first EEO discrimination complaint, bear only positive evaluations of Krois. Ford declares that she has "a very good working relationship with [Krois]. He has been respectful, supportive and helpful." Opp'n Ex. D at 58. Watson similarly avers that she has "always had a good working relationship with [Krois]. We never had much cross over. He was very professional and very easy to approach and discuss things with." *Id.* at 61.

*See Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (denying a hostile work environment claim in part because "none of the comments or actions directed at [the plaintiff] expressly focused on his [protected status]"). Gray alleges that Hewitt took two years to realize "she had a degree in psychology, not English," and that Hewitt "yelled at Gray, belittled, mocked, and otherwise criticized her competence." *Id.* ¶¶ 22-23; *see also* Opp'n Ex. N at 201-02. Gray makes no factual allegations, however, that such hostility occurred *because of* her protected status. Gray does not claim that Hewitt made derogatory remarks about her gender. And while allegations that a supervisor "yelled at, belittled, . . . [or] criticized [the] competence" of a junior employee may create a reasonable inference that the supervisor is rude, they do not create a reasonable inference that the supervisor is hostile on account of the employee's gender.[33] *See Anderson*, 477 U.S. at 248 (A dispute is only genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

Moreover, the alleged abuse is neither pervasive nor severe enough to create an abusive working environment. Regarding pervasiveness, Gray vaguely addresses incidents of abuse by Hewitt prior to 2005, alleging that such hostility resulted in "severe emotional distress" requiring medication. Compl. ¶ 23. Gray then claims that once she "complained about being passed over because of her gender and age, the harassment intensified," citing allegations that "her input now became less [tolerated] than before; she was treated with disdain, snubbed, and excluded from meetings where previously she had been, at least, reluctantly welcome." *Id.* ¶ 25. Yet Gray fails to present evidence of a single instance of such acts of disdain or shaming, other than her

---

[33] "'Everyone can be characterized by sex . . . and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration [actions] that lack a linkage of correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals.'" *Bryant v. Brownlee*, 265 F. Supp. 2d 52, 63 (D.D.C. 2003) (quoting *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002)) (alteration added).

purported exclusion from one meeting and removal from a presentation. But neither of such alleged "snubb[ings]" meets the severity requirement for hostile work environment claims, *see infra*. Furthermore, Gray contradicts her own claim of retaliatory harassment when, in her 2007 deposition, she admits that "over the years [Hewitt] . . . bec[ame] more careful about" his allegedly abusive behavior. Opp'n Ex. N at 196. Thus, even if Hewitt's supposed conduct from the 2004 timeframe was either linked to Gray's protected status or sufficiently severe, the Court cannot deem such conduct as "pervasive" given no evidence of the frequency with which such "yell[ing]" occurred prior to 2005 and a concession from Gray that the hostility from Hewitt largely ceased for the final three years of Gray's employment with the FAA.

Gray's hostile work environment claims also fail to satisfy the stringent conception of severity maintained by this Circuit. The DOT is correct that this Circuit "has granted summary judgment in the employer's favor in cases with much more egregious allegations than [Gray] has made here," and the example case it cites for this proposition is directly on point. Mot. Summ. J. at 16. As Judge Roberts explained in *Houston v. SecTek, Inc.*, the Circuit "has found that even constant yelling and hostile behavior, and isolated references to a protected status may be insufficient to support a hostile work environment claim." 680 F. Supp. 2d 215, 224 (D.D.C. 2010) *aff'd*, 407 F. App'x 490 (D.C. Cir. 2011). Judge Roberts, collecting cases, effectively illustrates this point:

> In *Singh v. U.S. House of Representatives*, 300 F.Supp.2d 48, 54–57 (D.D.C. 2004), the plaintiff's allegations that her employer humiliated her at meetings, screamed at her in one instance, told her to 'shut up and sit down' in another instance, and treated her in a manner that was 'constantly hostile and hypercritical' did not amount to a hostile work environment, even though these actions may have been disrespectful and unfair. Similarly, the fact that an employee and his immediate supervisor repeatedly 'butted heads' and that the supervisor frequently yelled at the employee during discussions about his work and 'threatened' job-related consequences for the employee's refusals to meet

> workplace expectations did not demonstrate a hostile work environment pervaded
> by discrimination. *Franklin v. Potter*, 600 F.Supp.2d 38, 77–78 (D.D.C. 2009).

*Id.* at 224-25. The *Singh* and *Franklin* examples encompass substantially all of Gray's allegations of a hostile work environment—that "her input and comments were largely ignored," that "Hewitt yelled at [her], belittled, mocked, and otherwise criticized her competence," and that "she was treated with disdain [and] snubbed." Compl. ¶¶ 22-23, 25. The fact that Gray may have sought out "medical attention" for anxiety related to her workplace environment, Compl. ¶ 23, does not change the result here, since the Court only evaluates whether the conduct in question created an "*objectively* hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive." *Harris*, 510 U.S. at 21.

According to the DOT, Gray received discovery from the defendant on December 6, 2013. *See* ECF Nos. 36, 38. Gray never objected to any perceived incompleteness of such discovery. In addition, the scheduled discovery period, during which Gray presumably could have continued to pursue her own investigation apart from those documents delivered from the DOT's custody, did not conclude until March 31, 2014, *see* ECF No. 40—nearly a year from the original Scheduling Order setting discovery deadlines, ECF No. 29 (Apr. 12, 2013). Nevertheless, Gray's purported evidence of a hostile work environment remains identical to what the plaintiff asserted in her pleadings. Perhaps even more notable is that Gray's opposition to the DOT's motion for summary judgment is entirely devoid of any argument related to her hostile work environment claim. *See* Opp'n at 14-21. In fact, the only time Gray mentions the existence of a hostile work environment claim is when she references its inclusion in her two EEO complaints. *Id.* at 3, 12. Consequently, the Court is left with no basis upon which to let Gray's hostile work environment claim go to trial, and must grant the DOT's motion for summary judgment.

## IV.  CONCLUSION

For the foregoing reasons, the Court GRANTS the defendant's motion for summary judgment [47].  This case is hereby dismissed.

A separate Order consistent with this Memorandum Opinion shall issue this date.

Signed by Royce C. Lamberth, United States District Judge, on November 10, 2014.